

June 14, 2016

Brendan Sodikoff

Dear Brendan:

I am thrilled to offer you the role of Founder & Co-President of RH Hospitality. I am excited about partnering with you to develop a world class hospitality platform that redefines the industry. We believe your creative and executional capabilities in the hospitality space joining forces with RH's authority for defining taste and style is a rare and unique combination that can be transformative.

Given the importance of the role that you will play at RH in leading our hospitality effort, we have created a differentiated compensation construct that is designed to provide you with substantial upside as you drive the development of this new business venture and manage its growth into a major new category for RH. Below is a summary of the most important details of our offer to you.

| | |
|---|---|
| TITLE | Founder & Co-President RH Hospitality. |
| DIRECT REPORT | Gary Friedman, Chairman & CEO. |
| START DATE | June 14, 2016. |
| SALARY | Your initial base salary shall be $450,000 per annum paid in accordance with the Company's normal payroll practices. Subject to continued service and satisfactory performance, you will be eligible to receive annual increases to your base salary in accordance with the Company's completion of its annual performance review process for the prior year (your base salary as in effect from time to time, the "Base Salary"). In the first two years of your employment, you will receive an automatic increase to your Base Salary (a) to $500,000 on the one year anniversary of your employment start date with the Company and (b) to $550,000 on the second year anniversary of your employment start date with the Company, in each case subject to satisfactory performance reviews by the Company. The Company will not reduce your then-effective Base Salary, unless such reduction is made in the same proportion to the reduction of the base salaries of a significant number of other members of management or similarly situated employees of the Company. |

sf-3645625

LEADERSHIP OF RH HOSPITALITY

One of your primary areas of responsibility shall be to oversee the growth and implementation of the RH Hospitality business which is expected to include additional cafes and restaurant locations as well as RH Guesthouse. In the first phase of launching this new business, we collaborated with you to develop and launch the 3 Arts Club Café in the Chicago Gallery and to conceptualize the first RH Guesthouse that will be launched in New York City. Your new role as leader of this business will be to drive the entire business to the next level. You will create the management structure for this new business, hire the managers and manage the organization going forward. Our expectation is that each new café, restaurant and RH Guesthouse will be uniquely tailored to local market conditions and you will collaborate closely with the RH CEO to develop these new locations in conjunction with RH's other business offering in each market. After these new locations are developed and launched, you will then be in charge of overseeing the operations of the RH Guesthouse, café and restaurant operations, which will include responsibilities such as the hiring of managers and providing ultimate oversight at all locations.

STAFFING AND RESOURCES FOR RH PROJECTS

One of your primary initial responsibilities will be to create a management structure and organization that can oversee the entire RH Hospitality business under your leadership. You will be in charge of all hiring decisions for this organization. You will develop and staff a management team to oversee the creation, launch and running of the food and beverage concepts as well as RH Guesthouse. It is expected that RH will hire additional full-time management personnel to assist you in the performance of your job. In the near term you have identified a need to hire, at RH's expense, a senior culinary chef and a full-time restaurant operator each of whom will be dedicated to RH projects but the exact needs for staffing of the organization will be developed over time.

In addition, you and RH acknowledge and agree that you may enlist additional support for your job requirements at RH from personnel who work for Hogsalt Hospitality Management LLC ("Hogsalt"), a consulting and restaurant development business that you control and in which you own a substantial equity stake. As an example, you might recommend bringing experienced Hogsalt employees to an RH location to assist with an opening or to improve operations. In those cases, RH would reimburse Hogsalt for the employees' travel and lodging costs and, in the event of any extended assignments, RH would reimburse Hogsalt for a portion of the costs of salaries and benefits of such employees at rates to be agreed upon at the time. All such decisions will be made on a collaborative basis with the RH CEO, and subject to the RH CEO's approval.

SALES COMMISSION

As consideration of your agreement not to compete as provided in the Section of the letter entitled "Restricted Activities Provision", you shall be entitled to receive during the time of your employment by RH a "Sales Commission" (as defined in Attachment B) on certain revenue generated by RH as described in Attachment B.

LEADERSHIP INCENTIVE PROGRAM You will be eligible to participate in the RH Leadership Incentive Program (the "Program") that will make you eligible to earn annual cash bonus compensation (the "Annual Bonus") for each fiscal year based on the level of achievement of performance goals established by the RH CEO and/or the Compensation Committee of Restoration Hardware Holdings, Inc. (NYSE: RH) (the "Parent Company") in collaboration with you. RH acknowledges that the exact goals will be developed in the first instance by agreement between you and the RH CEO and you will have a substantial role in defining the right metrics to measure success for each phase of your leadership over the RH Hospitality organization. Your target Annual Bonus will be equal to 50% of your then applicable Base Salary. The attainment of the performance goals established as provided above shall be based upon financial performance metrics for RH as a whole and/or the RH Hospitality business and achievement thereof shall be determined and confirmed by the RH CEO and/or the Compensation Committee of Parent Company after completion of the RH fiscal year. It is anticipated that your performance goals will be weighted primarily toward the agreed upon performance metrics for the RH Hospitality business but a portion of your Annual Bonus opportunity may relate to performance metrics for RH as a whole (the exact percentage contribution of each set of performance metrics may change from year to year). All bonuses paid under this Program only shall become earned and payable after the end of each fiscal year on which the Company makes payments of bonuses to its executives under the Program, provided your employment continues through the payment date of the bonus. You will receive a copy of the Program upon your arrival and your Annual Bonus will be subject to the terms and conditions of the Program. The terms of the Program, and your participation in it, are subject to change at any time at the sole discretion of the Company. Any award for the fiscal year in which you begin your employment will be prorated based on your partial year of service.

EQUITY Subject to the commencement of your employment with the Company, the Parent Company has authorized the grant to you of a stock option to purchase 100,000 shares of common stock of the Parent Company. The per share exercise price of this stock option will be equal to the closing price of the Parent Company's common stock on your start date. The option will vest over a period of four years, with 25% vesting on each of the yearly anniversaries of your start date such that the option will be fully vested on the fourth yearly anniversary of your start date. The vesting of any unvested shares covered by this option shall cease upon the termination of your employment; *provided, however*, that in the event the Company terminates your employment without "Cause" (as defined in Attachment A) prior to the date on which this option becomes fully vested, and subject to your signing and not revoking the written release of claims described below within the time period set forth in such written release and the expiration of any applicable revocation period contained in such written release, 25,000 of the 100,000 shares covered by this option will accelerate vesting on the date on which such release becomes effective and irrevocable; *and provided, further*, that any shares covered by the option that are vested on the date of your termination (and any shares covered by this option that accelerate vesting pursuant to the preceding clause) will continue to be exercisable post termination in accordance with the terms of the applicable option agreement. Your stock option award will be subject to the terms and conditions of the Parent Company 2012 Stock Incentive Plan and the applicable stock option agreement. The

form of your stock option agreement is included as <u>Attachment C</u>.

SEVERANCE    In the event the Company terminates your employment without Cause, you will be eligible to receive continuation of your base salary for a period of twelve (12) months less any required withholdings including for tax and social security purposes. You will not be eligible to receive any severance pay if your employment is terminated for Cause, by your death or "Disability" (as defined in <u>Attachment A</u>), or by your resignation. Your entitlement to any severance payments will be contingent upon your signing and not revoking the written release of claims provided to you by the Company within the time period set forth in such written release and the expiration of any applicable revocation period contained in such written release, provided that in no event will the period of time within which the written release must become effective exceed sixty (60) days following the date of your termination. If the release does not become effective and irrevocable by the deadline set forth in the release, you will forfeit any rights to the severance benefits described herein. In no event will any severance benefits be paid under this offer letter until the release becomes effective and irrevocable. Subject to <u>Attachment A</u>, after the release becomes effective and irrevocable severance benefits will commence as promptly as practicable thereafter, in accordance with the Company's normal payroll policies.

401K PLAN    Upon meeting length of service and other eligibility requirements (90 days of service and 21 years of age), you will be able to participate in the Company's 401(k) plan.

MEDICAL    You will be eligible to participate in the Company's group health benefits per the
BENEFITS    Company's guidelines.

VACATION    You will be eligible to participate in a pro rata amount of the following benefits in accordance with your part-time schedule (on a 60% of full-time basis): 20 vacation days, 5 sick days, 1 personal day, 1 floating holiday and 6 paid holidays per year, all of which shall accrue and may be used in accordance with Company policy. By way of example, instead of 20 vacation days per year, you will be eligible to accrue up to 12 vacation days per year (based on your part-time schedule). Notwithstanding the foregoing, RH acknowledges that the amount of time that you dedicate to RH as an employee will fluctuate based on the demands and requirements of your tasks. This provision is not meant to specify the exact portion of time per week, month or year to which you must devote time to RH, as you will have flexibility regarding how you allocate your work for RH from time to time, subject to the duties and requirements of your role and responsibilities at RH.

ASSOCIATE DISCOUNT — You will be eligible for a generous Associate discount in accordance with standard RH practices. The Associate discount currently includes 40% off regularly priced merchandise, 30% off outlet items, and 20% off sale items. Please consult the Company's written policies with respect to Associate discounts for further information regarding your entitlement and use of this benefit, as well as certain exceptions to the discount, and changes to the program from time to time.

RESTRICTED ACTIVITIES PROVISION — You acknowledge and agree that in your role as Founder & Co-President RH Hospitality you shall acquire confidential and proprietary information belonging to RH (including those of its affiliates such as Parent Company and Restoration Hardware, Inc.). The Sales Commission provided to you in this offer letter is additional consideration in excess of your Base Salary, bonus opportunity and equity award provided under this offer letter. The Sales Commission is being provided expressly as consideration of your agreement not to compete as provided in this "Restricted Activities Provision" of the letter. You agree to the restrictions on competitive activities set forth below as reasonable restrictions both in scope and duration in relation to your employment by RH and the services you are providing to RH. You further agree that any Sales Commission paid to you will be returned and forfeited in the event that you do not agree to and comply with the reasonable restrictions on your activities set forth herein. In order to preserve and protect the information and the assets of the Company, you agree that you will not, directly or indirectly, without the Company's express written consent, during (i) the period of your employment by the Company and for a period of (ii) 24 months after any termination of your employment with the Company that is made at your election, or 12 months after the termination of your employment that is made at the election of the Company:

> (a) divert any RH opportunity to Hogsalt or to any other business entity or operation;

> (b) disclose any information about RH's activities to anyone outside RH (except you may disclose information on a "need to know" basis in order to perform agreed upon duties and services for RH as contemplated by this offer letter (i) to your legal and financial advisors and (ii) during the period of your employment, to Hogsalt employees so long as such employees of Hogsalt also are subject to confidentiality obligations not to use or further disclose the information);

> (c) develop or operate (or assist in the development or operation of) any food service operation for yourself, Hogsalt or any third party that is located in a city in which RH launches a Café or restaurant if such food service operation is (i) based on a substantially similar concept as any operation you design or operate for the Company, and/or (ii) is operated under the same or a substantially similar trade name as any operation you design or operate for the Company (for the avoidance of doubt, you can open other locations within a city in which RH launches a Café or restaurant but not one based on a substantially similar concept and/or operated under a substantially similar trade name as the Company's Café or restaurant). In furtherance and not in limitation of the foregoing (A) in the event that you plan to develop or plan to operate (or plan to assist in the development or operation of) any food service operation for yourself, Hogsalt or any third party within the immediate

vicinity of an RH Café or restaurant location, you agree to give RH advance written notice of such plans and the opportunity to discuss any possible competitive overlap relating thereto including whether such operation is competitive in a manner prohibited under this offer letter, and (B) you will not operate, manage or otherwise be involved in any in-store café of any competitor of RH that sells home furnishings and provides design services;

     (d) subject to subsection (b) above, use or disclose to any third party the Company's proprietary information for any purpose at any time;

     (e) engage in any acts of unfair competition, including but not limited to use or disclosure of the Company's confidential, proprietary, or trade secret information for the benefit of or to any competitor; or

     (f) solicit for hire or hire any associate or key consultant of the Company with whom you became familiar or otherwise gained any knowledge of while you were employed by the Company or induce any such associate or consultant to work for another or to terminate services with the Company.

During the period of your service to RH under this offer letter, if there is any dispute or controversy regarding your opening, support or involvement with a hospitality concept that RH determines to be competitive with the offerings of RH, you and RH shall engage in a dispute resolution process involving direct negotiations between you and Gary Friedman in order to address the issue in question and seek to resolve the dispute or controversy.

EMPLOYMENT STATUS
You will be employed by RH, US LLC, which is sometimes referred to as "RH" or the "Company" in this offer letter. As an employee of the Company you will work closely with the senior leadership of the Company under the direction and control of RH. All amounts payable to you under this offer letter including the Sales Commission will be subject to applicable employment withholding including for taxes and social security payments. Your position is a part-time employee with RH. For the avoidance of doubt, you acknowledge and agree that your time spent working for RH during the period of your services under this offer letter will be in aggregate at least 50% of your total work time for all forms of work you undertake including RH and any outside activities in total. The parties acknowledge (i) that the time that you spend working for RH may be less than or greater than 50% of your aggregate work time during different periods of your service under this offer letter and there will be fluctuations in the level of your work for RH and for other endeavors from time to time, and (ii) the primary issue shall not be the amount of time you work but instead your ability to complete successfully your role, duties and responsibilities to RH.

RIGHT TO PUBLICITY
You hereby grant to RH and its affiliates and their respective successors, licensees and assigns, a license and right ("Right to Publicity") to use (a) your name, likeness, person, personality, biographical information, and other rights of publicity, and (b) any associated copyrighted materials you may provide to RH and its affiliates and agents from time-to-time including images or biographical information, in and in connection with and with reference to any Café or other food or beverage hospitality service or location that you are involved with developing in connection with this offer

letter including any such offering that is operated in connection with an RH Guesthouse (collectively, "Projects"), including, without limitation, in connection with any personal appearances and statements that you may make and, with respect to any and all other publicity, advertising, marketing, promotion and endorsements associated with one or more Projects. You shall have a reasonable right of prior approval (which approval shall not be unreasonably withheld) for the content of any such publicity, advertising, marketing, promotion or endorsements. Once you grant approval with respect to any publicity, advertising, marketing, promotion or endorsements, it shall not be necessary for RH to seek your approval for each subsequent use of similar materials that are consistent with materials you have previously approved for use by RH. For the avoidance of doubt (i) you have received adequate consideration for this Right to Publicity, (ii) this Right to Publicity shall continue in the event of any cessation of your employment, and (iii) this Right to Publicity may not be cancelled or revoked and is on a worldwide basis.

PERMITTED OUTSIDE ACTIVITIES It is acknowledged and agreed by RH that you may undertake outside activities in the area of food service and hospitality including through the business of Hogsalt during the time of your employment by RH and during the post-employment period of restrictions on your activities as set forth above under the Restricted Activities Provision. Subject to you observing the requirements of this offer letter, the fact of such outside activities is not deemed by RH to be a conflict of interest with your role at RH or in and of itself a violation of the Restricted Activities Provision set forth above.

The language that follows reflects our standard and legally required offer letter language. We don't mean for it to come across as impersonal, but rather, as sound and necessary information for you to know from the outset of your working relationship with us.

The relationship between you and the Company is called "at-will employment." This means that employment with the Company is for no specific period of time. As a result, either you or the Company is free to terminate your employment relationship at any time and for any reason, with or without Cause and with or without notice. Although your job duties, title, compensation, benefits, or the Company's policies, practices and procedures may change from time to time, the "at-will" nature of your employment may only be changed in an express writing signed by both you and the RH CEO. Your entire offer is also contingent upon successful completion of your background and reference checks.

In addition to the above, it is mandatory and a condition of employment that you read, become familiar with and follow the policies and procedures contained in the RH Associate Handbook, which you will be provided upon commencement of your employment. Of course, the policies contained in the Associate Handbook may change because of business necessity, changed circumstances, changes in law, or because it may be in the best interests of the Company. You agree to fully and faithfully follow all such rules, standards, instructions of management and changes in Company policy as they may be implemented from time to time.

Your employment is contingent on you executing a Proprietary Information and Inventions Agreement, *which contains a representation and agreement by you that by accepting employment with the Company, you will not be violating any agreements and obligations which you may have with any of your current or former employers.* This includes prohibitions related to the unauthorized or illegal use and possession of confidential or proprietary information and other materials that may belong to your prior employer. You agree that you have notified RH of any non-solicitation agreements or obligations you may have which

could prevent you from performing your duties for RH. RH reserves the right to rescind this offer in the event you have failed to disclose any such agreements or obligations.

Your employment is also contingent on you executing a Confirmation of Confidential Treatment, which obligates you to treat certain information and materials received from the Company as confidential.

Finally, your employment is also contingent upon providing the Company with legal proof of your identity and authorization to work in the United States at the time of hire.

I am enclosing two copies of this offer letter. Please sign and return one copy to the People Team and keep the other copy for your files. This offer letter contains our entire agreement and understanding regarding the terms of your employment with the Company and supersedes any prior offers, representations or agreements, whether written or oral. This offer letter may be modified only in an express writing signed by both you and the RH CEO. As you are a resident of Illinois, this offer letter agreement is to be construed in accordance with and governed by the laws of the State of Illinois without giving effect to any choice of law rules. This offer letter will expire within 3 business days of the date of this offer letter.

Brendan, we are very excited about you joining the RH team and look forward to your contributions to the growth and success of the Company.

Sincerely,

Gary Friedman
Chairman & CEO

cc: People Team

⇨ *I understand and agree to the terms of this offer of employment*:

Brendan Sodikoff

$\underline{O6\text{-}14\text{-}2016}$
Date

Definition of Cause. "Cause" shall mean: (a) an act or acts of personal dishonesty, fraud, or embezzlement; (b) material violation by you of any of your obligations under this offer letter for ten days after written notice from the Company; (c) any willful, deliberate, or repeated refusal to follow the requests or instructions of the Company; (d) any grand jury indictment, conviction, or plea of guilty or no contest (also known as "nolo contendre") of or by (as applicable) you for any felony or other crime involving dishonesty or moral turpitude; (e) your failure to abide by the Company's published policies and procedures in all material respects after five days written notice from the Company; (f) illegal possession or use of any controlled substance; or (g) other actions by you that cause material adverse effects on the Company's reputation and/or relationships with its customers, suppliers, and vendors. Upon any termination for Cause, you will be entitled to be paid all compensation owed through the date of termination and the Company shall have no further liability hereunder (other than for reimbursement for reasonable business expenses incurred prior to the date of termination).

Disability. "Disability" shall mean that you are unable to carry out the responsibilities and functions of the position held by you by reason of any physical or mental impairment for more than 120 days in any twelve-month period. If you suffer from a disability, then, to the extent permitted by law, the Company may terminate your employment. The Company shall pay to you all compensation to which you are entitled up through the date of termination, and thereafter all obligations of the Company under this offer letter shall cease. You will not be entitled to any severance payments. Nothing in this offer letter shall affect your rights under any disability plan in which you are a participant.

Compliance with Section 409A. Notwithstanding anything to the contrary in this offer letter, no severance pay or benefits to be paid or provided to you, if any, pursuant to this offer letter or otherwise that, when considered together with any other severance payments or separation benefits, are considered deferred compensation under Section 409A of the Internal Revenue Code of 1986, as amended, and the final regulations and any guidance promulgated thereunder ("Section 409A") (together, the "Deferred Payments") will be paid or otherwise provided until you have had a "separation from service" within the meaning of Section 409A. Similarly, no severance payable to you, if any, that otherwise would be exempt from Section 409A pursuant to Treasury Regulation Section 1.409A-1(b)(9) will be payable until you have had a "separation from service" within the meaning of Section 409A. Each payment and benefit payable under this offer letter is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations. Notwithstanding anything herein to the contrary, any severance payments or benefits under this offer letter that would be considered Deferred Payments will be paid or will commence on the sixtieth (60th) day following your separation from service (with the first payment equal to the unpaid amounts of severance that accrued during the sixty (60) days following your date of termination), or, if later, such time as required by the next paragraph.
Notwithstanding anything herein to the contrary, if you are a "specified employee" within the meaning of Section 409A at the time of your separation (other than due to death), then the Deferred Payments that would otherwise have been payable within the first six (6) months following your separation from service, will be paid on the first payroll date that occurs on or after the date six (6) months and one (1) day following the date of your separation from service, but in no event later than seven (7) months after the date of such separation from service. All subsequent Deferred Payments, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit.

Notwithstanding anything herein to the contrary, if you die following your separation from service, but within six (6) months of your separation from service, then any payments delayed in accordance with this paragraph will be payable in a lump sum as soon as administratively practicable after the date of your death and all other Deferred Payments will be payable in accordance with the payment schedule applicable to each payment or benefit. Any amount paid under this offer letter that satisfies the

requirements of the "short-term deferral" rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations will not constitute Deferred Payments. Any amount paid under this offer letter that qualifies as a payment made as a result of an involuntary separation from service pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations that does not exceed the Section 409A Limit (as defined below) will not constituted Deferred Payments. For this purpose, the "Section 409A Limit" will mean two (2) times the lesser of: (i) your annualized compensation based upon the annual rate of pay paid to you during your taxable year preceding the taxable year of your separation from service as determined under Treasury Regulation Section 1.409A-1(b)(9)(iii)(A)(1) and any Internal Revenue Service guidance issued with respect thereto; or (ii) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Internal Revenue Code for the year in which your separation from service occurred. The foregoing provisions are intended to comply with the requirements of Section 409A so that none of the severance payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. The Company and you agree to work together in good faith to consider amendments to this offer letter and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition prior to actual payment to you under Section 409A.

## Attachment B

One of your primary areas of responsibility shall be to oversee the conceptualization and development of additional cafes and restaurant locations in a manner similar to the way in which RH's 3 Arts Club Café in Chicago was created and developed (such locations, including the 3 Arts Club Café, are referred to herein as the "Cafes"). After these locations are developed, you will then be in charge of overseeing the management of the Cafes while you are employed by RH. Overseeing the management of the Cafes does not mean you are required to be the site manager for each location and the plan shall instead be for you to hire site managers for each such location and for you to manage and oversee such managers.

The commission rate shall be 2.5% of Net Revenue (the "Sales Commission") and shall be payable on a quarterly basis within sixty days after the final Net Revenue figures are available for any fiscal quarter; provided, further that the Sales Commission for any particular fiscal quarter shall be paid not later than March 15 of the year following such fiscal quarter.

The Sales Commission shall be applicable to Net Revenue of the Cafes during the time you are employed by the Company and overseeing management of such Cafes (for the avoidance of doubt, the Sales Commission with respect to the 3 Arts Club Café shall be applicable after September 8, 2016 as described further below).

"Net Revenue" of a Café is actual revenue as determined by RH in accordance with generally accepted account principles as applied by RH for its business from time to time, net of any concessions, discounts, sales or use taxes, tips, rebates, chargebacks, healthcare taxes, refunds, commissions or other similar deductions applicable in the hospitality industry as RH reasonably determines from time to time.

The following types of revenue are expressly excluded from the definition of Net Revenue for purposes of calculating your Sales Commission (i) revenue of any café or restaurant that is developed primarily for use by RH personnel including the café to be developed at the RH corporate offices in Corte Madera, California; (ii) any revenues with respect to the hotel or service aspects of the RH Guesthouse concept other than revenue related to a restaurant or food service offering in such RH Guesthouse that is designed and developed by you and for which you oversee the ongoing management; and (iii) revenue from such other items as you and the RH CEO may jointly determine to exclude from time to time.

RH's agreement with Hogsalt dated September 8, 2015 governing the development, management and operation of the 3 Arts Club Café in Chicago is intended to cover the development and launch of the 3 Arts Club Café location in Chicago as well as the first year of its operation. Such agreement will expire in accordance with its terms on September 8, 2016 after which date management of the 3 Arts Club Café will also be overseen by you while you are employed by RH under this offer letter and from and after such date the Net Revenue of such location shall also be subject to the Sales Commission.

RH shall make the final determination of Net Revenue in accordance with its policies, practices and procedures in effect from time to time, which shall generally be consistent with prevailing industry practices taking into account the unique nature of RH's operations. You shall have the right to review any determination of Net Revenue under this offer letter and RH shall cooperate to provide you with such information as may be reasonably necessary to review Net Revenue. Any such review shall be at your sole cost and expense except that RH shall reimburse you for your reasonable costs and expenses of such a review if as a result of the review the determination of Net Revenue made by RH is underreported by an amount greater than 5%.

For the avoidance of doubt, in the event your employment by RH shall cease at any time in accordance with this offer letter, the Sales Commission applicable to Net Revenue under this offer letter will cease as of the date your employment terminates and you will be eligible for and paid applicable Sales Commission on Net Revenue in accordance with the normal timing for payment of Sales Commission under this offer letter only for the portion of applicable Net Revenue through the date your employment ceases.

**Attachment C**

<u>ATTACHMENT C</u>

## RESTORATION HARDWARE HOLDINGS, INC.
## 2012 STOCK INCENTIVE PLAN

### <u>NOTICE OF STOCK OPTION AWARD</u>

Grantee's Name and Address:     BRENDAN SODIKOFF

You (the "Grantee") have been granted an option to purchase shares of Common Stock, subject to the terms and conditions of this Notice of Stock Option Award (the "Notice"), the Restoration Hardware Holdings, Inc. 2012 Stock Incentive Plan, as amended from time to time (the "Plan") and the Stock Option Award Agreement (the "Option Agreement") attached hereto, as follows. Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Notice.

| | |
|---|---|
| Award Number | [                    ] |
| Date of Award | June 14, 2016 |
| Vesting Commencement Date | June 14, 2016 |
| Exercise Price per Share | $[                    ] |
| Total Number of Shares Subject to the Option (the "Shares") | 100,000 |
| Total Exercise Price | $[                    ] |
| Type of Option: | _____  Incentive Stock Option |
| |   X    Non-Qualified Stock Option |
| Expiration Date: | June 14, 2026 |
| Post-Termination Exercise Period: | Three (3) months |

<u>Vesting Schedule</u>:

Subject to the Grantee's Continuous Service and other limitations set forth in this Notice, the Plan and the Option Agreement, the Option may be exercised, in whole or in part, in accordance with the following schedule:

25% of the Shares subject to the Option shall vest on each yearly anniversary of the Vesting Commencement Date.

In the event the Grantee's Continuous Service is terminated by the Company without "Cause" (as defined in the Grantee's Offer Letter with the Company dated June 14, 2016 (the

sf-3653627

"Offer Letter")) prior to the date on which the Option becomes fully vested, and subject to the Grantee signing and not revoking the written release of claims described in the Offer Letter within the time period set forth in such written release and the expiration of any applicable revocation period contained in such written release, the portion of the Option that would have otherwise vested during the one (1) year period following such termination shall vest on the date on which such release becomes effective and irrevocable.

IN WITNESS WHEREOF, the Company and the Grantee have executed this Notice and agree that the Option is to be governed by the terms and conditions of this Notice, the Plan, and the Option Agreement.

Restoration Hardware Holdings, Inc.,
a Delaware corporation

_____
*Signature*

By: Karen Boone

Title: Chief Financial Officer

EXCEPT AS EXPRESSLY SET FORTH IN THE NOTICE, THE GRANTEE ACKNOWLEDGES AND AGREES THAT THE SHARES SUBJECT TO THE OPTION SHALL VEST, IF AT ALL, ONLY DURING THE PERIOD OF THE GRANTEE'S CONTINUOUS SERVICE (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THE OPTION OR ACQUIRING SHARES HEREUNDER). THE GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT NOTHING IN THIS NOTICE, THE OPTION AGREEMENT, OR THE PLAN SHALL CONFER UPON THE GRANTEE ANY RIGHT WITH RESPECT TO FUTURE AWARDS OR CONTINUATION OF THE GRANTEE'S CONTINUOUS SERVICE, NOR SHALL IT INTERFERE IN ANY WAY WITH THE GRANTEE'S RIGHT OR THE RIGHT OF THE COMPANY OR RELATED ENTITY TO WHICH THE GRANTEE PROVIDES SERVICES TO TERMINATE THE GRANTEE'S CONTINUOUS SERVICE, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE. THE GRANTEE ACKNOWLEDGES THAT UNLESS THE GRANTEE HAS A WRITTEN EMPLOYMENT AGREEMENT WITH THE COMPANY TO THE CONTRARY, THE GRANTEE'S STATUS IS AT WILL.

The Grantee acknowledges receipt of a copy of the Plan and the Option Agreement, and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts the Option subject to all of the terms and provisions hereof and thereof. The Grantee has reviewed this Notice, the Plan, and the Option Agreement in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Notice, and fully understands all provisions of this Notice, the Plan and the Option Agreement. The Grantee hereby agrees that all questions of interpretation and administration relating to this Notice, the Plan and the Option Agreement shall be resolved by the Administrator in accordance with Section 13 of the Option Agreement. The Grantee further agrees to the venue selection and waiver of a jury trial in accordance with

2

Section 14 of the Option Agreement. The Grantee further agrees to notify the Company upon any change in the residence address indicated in this Notice.

Dated: _____     Signed: _____

Grantee

**RESTORATION HARDWARE HOLDINGS, INC.**
**2012 STOCK INCENTIVE PLAN**

## STOCK OPTION AWARD AGREEMENT

1.       <u>Grant of Option</u>. Restoration Hardware Holdings, Inc., a Delaware corporation (the "Company"), hereby grants to the Grantee (the "Grantee") named in the Notice of Stock Option Award (the "Notice"), an option (the "Option") to purchase the Total Number of Shares of Common Stock subject to the Option (the "Shares") set forth in the Notice, at the Exercise Price per Share set forth in the Notice (the "Exercise Price") subject to the terms and provisions of the Notice, this Stock Option Award Agreement (the "Option Agreement") and the Company's 2012 Stock Incentive Plan, as amended from time to time (the "Plan"), which are incorporated herein by reference. Unless otherwise defined herein, the terms defined in the Plan and the Notice shall have the same defined meanings in this Option Agreement.

If designated in the Notice as an Incentive Stock Option, the Option is intended to qualify as an Incentive Stock Option as defined in Section 422 of the Code. However, notwithstanding such designation, the Option will qualify as an Incentive Stock Option under the Code only to the extent the $100,000 dollar limitation of Section 422(d) of the Code is not exceeded. The $100,000 limitation of Section 422(d) of the Code is calculated based on the aggregate Fair Market Value of the Shares subject to options designated as Incentive Stock Options which become exercisable for the first time by the Grantee during any calendar year (under all plans of the Company or any Parent or Subsidiary of the Company). For purposes of this calculation, Incentive Stock Options shall be taken into account in the order in which they were granted, and the Fair Market Value of the shares subject to such options shall be determined as of the grant date of the relevant option.

2.       <u>Exercise of Option</u>.

       (a)      <u>Right to Exercise</u>. The Option shall be exercisable during its term in accordance with the Vesting Schedule set out in the Notice and with the applicable provisions of the Plan and this Option Agreement. The Option shall be subject to the provisions of Section 11 of the Plan relating to the exercisability or termination of the Option in the event of a Corporate Transaction or Change in Control. The Grantee shall be subject to reasonable limitations on the number of requested exercises during any monthly or weekly period as determined by the Administrator. In no event shall the Company issue fractional Shares.

       (b)      <u>Method of Exercise</u>. The Option shall be exercisable by delivery of an exercise notice (a form of which is attached as Exhibit A) or by such other procedure as specified from time to time by the Administrator which shall state the election to exercise the Option, the whole number of Shares in respect of which the Option is being exercised, and such other provisions as may be required by the Administrator. The exercise notice shall be delivered in person, by certified mail, or by such other method (including electronic transmission) as determined from time to time by the Administrator to the Company accompanied by payment of the Exercise Price and all applicable income and employment taxes required to be withheld. The Option shall be deemed to be exercised upon receipt by the Company of such notice accompanied by the Exercise Price and all applicable withholding taxes, which, to the extent

1

selected, shall be deemed to be satisfied by use of the broker-dealer sale and remittance procedure to pay the Exercise Price provided in Section 3(d) below to the extent such procedure is available to the Grantee at the time of exercise and such an exercise would not violate any Applicable Law.

(c)     Taxes. No Shares will be delivered to the Grantee or other person pursuant to the exercise of the Option until the Grantee or other person has made arrangements acceptable to the Administrator for the satisfaction of applicable income tax and employment tax withholding obligations, including, without limitation, such other tax obligations of the Grantee incident to the receipt of Shares. Upon exercise of the Option, the Company or the Grantee's employer may offset or withhold (from any amount owed by the Company or the Grantee's employer to the Grantee) or collect from the Grantee or other person an amount sufficient to satisfy such tax withholding obligations. Furthermore, in the event of any determination that the Company has failed to withhold a sum sufficient to pay all withholding taxes due in connection with the Option, the Grantee agrees to pay the Company the amount of such deficiency in cash within five (5) days after receiving a written demand from the Company to do so, whether or not the Grantee is an employee of the Company at that time.

(d)     Section 16(b). Notwithstanding any provision of this Option Agreement to the contrary, other than termination of the Grantee's Continuous Service for Cause, if a sale within the applicable time periods set forth in Sections 5, 6 or 7 herein of Shares acquired upon the exercise of the Option would subject the Grantee to suit under Section 16(b) of the Exchange Act, the Option shall remain exercisable until the earliest to occur of (i) the tenth (10th) day following the date on which a sale of such Shares by the Grantee would no longer be subject to such suit, (ii) the one hundred and ninetieth (190th) day after the Grantee's termination of Continuous Service, or (iii) the date on which the Option expires.

3.     Method of Payment. Payment of the Exercise Price shall be made by any of the following, or a combination thereof, at the election of the Grantee; provided, however, that such exercise method does not then violate any Applicable Law and, provided further, that the portion of the Exercise Price equal to the par value of the Shares must be paid in cash or other legal consideration permitted by the Delaware General Corporation Law:

(a)     cash;

(b)     check;

(c)     surrender of Shares held for the requisite period, if any, necessary to avoid a charge to the Company's earnings for financial reporting purposes, or delivery of a properly executed form of attestation of ownership of Shares as the Administrator may require which have a Fair Market Value on the date of surrender or attestation equal to the aggregate Exercise Price of the Shares as to which the Option is being exercised;

(d)     payment through a "net exercise" such that, without the payment of any funds, the Grantee may exercise the Option and receive the net number of Shares equal to (i) the number of Shares as to which the Option is being exercised, multiplied by (ii) a fraction, the numerator of which is the Fair Market Value per Share (on such date as is determined by the

2

Administrator) less the Exercise Price per Share, and the denominator of which is such Fair Market Value per Share (the number of net Shares to be received shall be rounded down to the nearest whole number of Shares); or

(e)     payment through a broker-dealer sale and remittance procedure pursuant to which the Grantee (i) shall provide written instructions to a Company-designated brokerage firm to effect the immediate sale of some or all of the purchased Shares and remit to the Company sufficient funds to cover the aggregate exercise price payable for the purchased Shares and (ii) shall provide written directives to the Company to deliver the certificates for the purchased Shares directly to such brokerage firm in order to complete the sale transaction.

4.      Restrictions on Exercise. The Option may not be exercised if the issuance of the Shares subject to the Option upon such exercise would constitute a violation of any Applicable Laws. If the exercise of the Option within the applicable time periods set forth in Section 5, 6 and 7 of this Option Agreement is prevented by the provisions of this Section 4, the Option shall remain exercisable until one (1) month after the date the Grantee is notified by the Company that the Option is exercisable, but in any event no later than the Expiration Date set forth in the Notice.

5.      Termination or Change of Continuous Service. In the event the Grantee's Continuous Service terminates, the Grantee may, but only during the Post-Termination Exercise Period, exercise the portion of the Option that was vested at the date of such termination (the "Termination Date") or that becomes vested after the Termination Date in connection with the termination of the Grantee's Continuous Service by the Company without Cause in accordance with the terms of the Notice and the Offer Letter. The Post-Termination Exercise Period shall commence on the Termination Date. In no event, however, shall the Option be exercised later than the Expiration Date set forth in the Notice. In the event of the Grantee's change in status from Employee, Director or Consultant to any other status of Employee, Director or Consultant, the Option shall remain in effect and the Option shall continue to vest in accordance with the Vesting Schedule set forth in the Notice; provided, however, that with respect to any Incentive Stock Option that shall remain in effect after a change in status from Employee to Director or Consultant, such Incentive Stock Option shall cease to be treated as an Incentive Stock Option and shall be treated as a Non-Qualified Stock Option on the day three (3) months and one (1) day following such change in status. Except as provided in this Section 5, or Sections 6 and 7 below, to the extent that the Option was unvested on the Termination Date, or if the Grantee does not exercise the vested portion of the Option within the Post-Termination Exercise Period, the Option shall terminate.

6.      Disability of Grantee. In the event the Grantee's Continuous Service terminates as a result of his or her Disability, the Grantee may, but only within twelve (12) months commencing on the Termination Date (but in no event later than the Expiration Date), exercise the portion of the Option that was vested on the Termination Date; provided, however, that if such Disability is not a "disability" as such term is defined in Section 22(e)(3) of the Code and the Option is an Incentive Stock Option, such Incentive Stock Option shall cease to be treated as an Incentive Stock Option and shall be treated as a Non-Qualified Stock Option on the day three (3) months and one (1) day following the Termination Date. Except as provided in Section 5, to the extent that the Option was unvested on the Termination Date, or if the Grantee does not

3

exercise the vested portion of the Option within the time specified herein, the Option shall terminate. Section 22(e)(3) of the Code provides that an individual is permanently and totally disabled if he or she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months.

       7.     Death of Grantee. In the event of the termination of the Grantee's Continuous Service as a result of his or her death, or in the event of the Grantee's death during the Post-Termination Exercise Period or during the twelve (12) month period following the Grantee's termination of Continuous Service as a result of his or her Disability, the person who acquired the right to exercise the Option pursuant to Section 8 may exercise the portion of the Option that was vested at the date of termination within twelve (12) months commencing on the date of death (but in no event later than the Expiration Date). To the extent that the Option was unvested on the date of death, or if the vested portion of the Option is not exercised within the time specified herein, the Option shall terminate.

       8.     Transferability of Option. The Option, if an Incentive Stock Option, may not be transferred in any manner other than by will or by the laws of descent and distribution and may be exercised during the lifetime of the Grantee only by the Grantee. The Option, if a Non-Qualified Stock Option, may not be transferred in any manner other than by will or by the laws of descent and distribution, provided, however, that a Non-Qualified Stock Option may be transferred during the lifetime of the Grantee to the extent and in the manner authorized by the Administrator. Notwithstanding the foregoing, the Grantee may designate one or more beneficiaries of the Grantee's Incentive Stock Option or Non-Qualified Stock Option in the event of the Grantee's death on a beneficiary designation form provided by the Administrator. Following the death of the Grantee, the Option, to the extent provided in Section 7, may be exercised (a) by the person or persons designated under the deceased Grantee's beneficiary designation or (b) in the absence of an effectively designated beneficiary, by the Grantee's legal representative or by any person empowered to do so under the deceased Grantee's will or under the then applicable laws of descent and distribution. The terms of the Option shall be binding upon the executors, administrators, heirs, successors and transferees of the Grantee.

       9.     Term of Option. The Option must be exercised no later than the Expiration Date set forth in the Notice or such earlier date as otherwise provided herein. After the Expiration Date or such earlier date, the Option shall be of no further force or effect and may not be exercised.

       10.    Tax Consequences. The Grantee may incur tax liability as a result of the Grantee's purchase or disposition of the Shares. THE GRANTEE SHOULD CONSULT A TAX ADVISER BEFORE EXERCISING THE OPTION OR DISPOSING OF THE SHARES.

       11.    Entire Agreement: Governing Law. The Notice, the Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and the Grantee with respect to the subject matter hereof, and may not be modified adversely to the Grantee's interest except by means of a writing signed by the Company and the Grantee.

4

Nothing in the Notice, the Plan and this Option Agreement (except as expressly provided therein) is intended to confer any rights or remedies on any persons other than the parties. The Notice, the Plan and this Option Agreement are to be construed in accordance with and governed by the internal laws of the State of California without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of California to the rights and duties of the parties. Should any provision of the Notice, the Plan or this Option Agreement be determined to be illegal or unenforceable, such provision shall be enforced to the fullest extent allowed by law and the other provisions shall nevertheless remain effective and shall remain enforceable.

12.     Construction. The captions used in the Notice and this Option Agreement are inserted for convenience and shall not be deemed a part of the Option for construction or interpretation. Except when otherwise indicated by the context, the singular shall include the plural and the plural shall include the singular. Use of the term "or" is not intended to be exclusive, unless the context clearly requires otherwise.

13.     Administration and Interpretation. Any question or dispute regarding the administration or interpretation of the Notice, the Plan or this Option Agreement shall be submitted by the Grantee or by the Company to the Administrator. The resolution of such question or dispute by the Administrator shall be final and binding on all persons.

14.     Venue and Waiver of Jury Trial. The Company, the Grantee, and the Grantee's assignees pursuant to Section 8 (the "parties") agree that any suit, action, or proceeding arising out of or relating to the Notice, the Plan or this Option Agreement shall be brought in the United States District Court for the Northern District of California (or should such court lack jurisdiction to hear such action, suit or proceeding, in a California state court in the County of San Francisco) and that the parties shall submit to the jurisdiction of such court. The parties irrevocably waive, to the fullest extent permitted by law, any objection the party may have to the laying of venue for any such suit, action or proceeding brought in such court. THE PARTIES ALSO EXPRESSLY WAIVE ANY RIGHT THEY HAVE OR MAY HAVE TO A JURY TRIAL OF ANY SUCH SUIT, ACTION OR PROCEEDING. If any one or more provisions of this Section 14 shall for any reason be held invalid or unenforceable, it is the specific intent of the parties that such provisions shall be modified to the minimum extent necessary to make it or its application valid and enforceable.

15.     Notices. Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery, upon deposit for delivery by an internationally recognized express mail courier service or upon deposit in the United States mail by certified mail (if the parties are within the United States), with postage and fees prepaid, addressed to the other party at its address as shown in these instruments, or to such other address as such party may designate in writing from time to time to the other party.

**END OF AGREEMENT**

<u>EXHIBIT A</u>

## RESTORATION HARDWARE HOLDINGS, INC.
## 2012 STOCK INCENTIVE PLAN

### <u>EXERCISE NOTICE</u>

Restoration Hardware Holdings, Inc.
15 Koch Road, Suite J
Corte Madera, CA 94925
Attention: Secretary

1.　　<u>Exercise of Option</u>. Effective as of today, ＿＿＿＿＿＿＿, ＿＿ the undersigned (the "Grantee") hereby elects to exercise the Grantee's option to purchase ＿＿＿＿＿＿ shares of the Common Stock (the "Shares") of ＿＿＿＿＿＿＿, Inc. (the "Company") under and pursuant to the Company's 2012 Stock Incentive Plan, as amended from time to time (the "Plan") and the [ ] Incentive [ ] Non-Qualified Stock Option Award Agreement (the "Option Agreement") and Notice of Stock Option Award (the "Notice") dated ＿＿＿＿＿＿＿, ＿＿＿＿＿＿. Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Exercise Notice.

2.　　<u>Representations of the Grantee</u>. The Grantee acknowledges that the Grantee has received, read and understood the Notice, the Plan and the Option Agreement and agrees to abide by and be bound by their terms and conditions.

3.　　<u>Rights as Stockholder</u>. Until the stock certificate evidencing such Shares is issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the Shares, notwithstanding the exercise of the Option. The Company shall issue (or cause to be issued) such stock certificate promptly after the Option is exercised. No adjustment will be made for a dividend or other right for which the record date is prior to the date the stock certificate is issued, except as provided in Section 10 of the Plan.

4.　　<u>Delivery of Payment</u>. The Grantee herewith delivers to the Company the full Exercise Price for the Shares, which, to the extent selected, shall be deemed to be satisfied by use of the broker-dealer sale and remittance procedure to pay the Exercise Price provided in Section 3(e) of the Option Agreement.

5.　　<u>Tax Consultation</u>. The Grantee understands that the Grantee may suffer adverse tax consequences as a result of the Grantee's purchase or disposition of the Shares. The Grantee represents that the Grantee has consulted with any tax consultants the Grantee deems advisable in connection with the purchase or disposition of the Shares and that the Grantee is not relying on the Company for any tax advice.

6.　　<u>Taxes</u>. The Grantee agrees to satisfy all applicable foreign, federal, state and local income and employment tax withholding obligations and herewith delivers to the Company the full amount of such obligations or has made arrangements acceptable to the Company to satisfy such obligations. In the case of an Incentive Stock Option, the Grantee also agrees, as

1

partial consideration for the designation of the Option as an Incentive Stock Option, to notify the Company in writing within thirty (30) days of any disposition of any shares acquired by exercise of the Option if such disposition occurs within two (2) years from the Date of Award or within one (1) year from the date the Shares were transferred to the Grantee.

7.    Successors and Assigns.  The Company may assign any of its rights under this Exercise Notice to single or multiple assignees, and this agreement shall inure to the benefit of the successors and assigns of the Company.  This Exercise Notice shall be binding upon the Grantee and his or her heirs, executors, administrators, successors and assigns.

8.    Construction.  The captions used in this Exercise Notice are inserted for convenience and shall not be deemed a part of this agreement for construction or interpretation. Except when otherwise indicated by the context, the singular shall include the plural and the plural shall include the singular.  Use of the term "or" is not intended to be exclusive, unless the context clearly requires otherwise.

9.    Administration and Interpretation.  The Grantee hereby agrees that any question or dispute regarding the administration or interpretation of this Exercise Notice shall be submitted by the Grantee or by the Company to the Administrator.  The resolution of such question or dispute by the Administrator shall be final and binding on all persons.

10.    Governing Law; Severability.  This Exercise Notice is to be construed in accordance with and governed by the internal laws of the State of California without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of California to the rights and duties of the parties. Should any provision of this Exercise Notice be determined by a court of law to be illegal or unenforceable, such provision shall be enforced to the fullest extent allowed by law and the other provisions shall nevertheless remain effective and shall remain enforceable.

11.    Notices.  Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery, upon deposit for delivery by an internationally recognized express mail courier service or upon deposit in the United States mail by certified mail (if the parties are within the United States), with postage and fees prepaid, addressed to the other party at its address as shown below beneath its signature, or to such other address as such party may designate in writing from time to time to the other party.

12.    Further Instruments.  The parties agree to execute such further instruments and to take such further action as may be reasonably necessary to carry out the purposes and intent of this agreement.

13.    Entire Agreement.  The Notice, the Plan and the Option Agreement are incorporated herein by reference and together with this Exercise Notice constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and the Grantee with respect to the subject matter hereof, and may not be modified adversely to the Grantee's interest except by means of a writing signed by the Company and the Grantee.  Nothing in the Notice, the Plan, the

2

Option Agreement and this Exercise Notice (except as expressly provided therein) is intended to confer any rights or remedies on any persons other than the parties.

| Submitted by: | Accepted by: |
|---|---|
| GRANTEE: | RESTORATION HARDWARE HOLDINGS, INC. |
| | By: _____ |
| _____ | Title: _____ |
| (Signature) | |
| Address: | Address: |
| _____ | 15 Koch Road, Suite J |
| _____ | Corte Madera, CA 94925 |

3